UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 18-cv-24933-CMA

PATRICIA MELLNITZ,

    Plaintiff,

vs.

CARNIVAL CORPORATION,
SUN BAHAMAS WATER SPORTS d/b/a,
BAHAMAS STORGAGE AND SHIPPING,
SUPPLIES COMPANY LTD., AND
SUPPLIES CORPORATION,

    Defendants.

_____/

**SWORN DECLARATION OF LUCIANA INGRAHAM
IN SUPPORT OF CARNIVAL CORPORATION AND SUN BAHAMAS WATER
SPORTS d/b/a BAHAMAS STORAGE AND SHIPPING SUPPLIES COMPANY LTD.,
JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

    I, Luciana Ingraham, make this Sworn Declaration based upon my own personal knowledge and the business records of SUN BAHAMAS WATER SPORTS d/b/a BAHAMAS STORAGE AND SHIPPING SUPPLIES COMPANY LTD. and attest to the truth of the facts that are stated herein.

**General Declarations**

    1.    I am over twenty-one years of age and in all respects qualified to make this Declaration.

    2.    At all times relevant, including December 9, 2017 and the present, I have served as Senior Manager of SUN BAHAMAS WATER SPORTS d/b/a BAHAMAS STORAGE AND

SHIPPING SUPPLIES COMPANY LTD. ("SUN BAHAMAS"), a defendant in the above-captioned case, and I am authorized to make this Sworn Declaration on its behalf.

3. I have personal knowledge concerning the activities and daily operations of SUN BAHAMAS at all times material to this action.

4. SUN BAHAMAS was formed in 2016. Since its formation, SUN BAHAMAS has been, at all times, a private corporation registered in and existing under the laws of the Bahamas. SUN BAHAMAS has never been registered or incorporated in any other location or jurisdiction. Since its formation SUN BAHAMAS has maintained its principal and only place of business in Nassau, New Providence Bahamas.

5. Since its formation, SUN BAHAMAS has operated exclusively in Nassau, New Providence Bahamas, where it operates snorkeling tours from Nassau Harbor to Rose Island and back to Nassau Harbor.

6. On the date of the incident alleged in Plaintiff's Complaint, December 9, 2017, the Ultimate Island Snorkel & Beach Safari excursion was offered to Carnival passengers through a "Standard Shore Excursion Independent Contractor Agreement" between Carnival and SUN BAHAMAS. *See* Standard Shore Excursion Independent Contractor Agreement ("Agreement") in effect on the date of the incident alleged in the Complaint, December 9, 2017, attached as Exhibit "A". The Agreement is redacted to exclude confidential and sensitive pricing information. *See Id.*

### Jurisdictional Declarations

7. SUN BAHAMAS has never been incorporated, licensed or qualified to do business in the State of Florida. SUN BAHAMAS has never had subsidiaries incorporated or qualified to do business in Florida.

8. SUN BAHAMAS has never been incorporated in any other State or territory of the United States, and has never been licensed or qualified to do business anywhere in the United States. SUN BAHAMAS has never had parents or subsidiaries incorporated or qualified to do business in the United States.

9. SUN BAHAMAS has never committed any of the acts enumerated in Florida Statutes Sections 48.081, 48.181 or 48.193.

10. SUN BAHAMAS has never maintained any place of business within the State of Florida or elsewhere in the United States.

11. SUN BAHAMAS has never maintained any officers, directors, employees, and/or agents within the State of Florida or elsewhere in the United States.

12. SUN BAHAMAS has never had an office, branch office or comparable facilities in the State of Florida or elsewhere in the United States.

13. SUN BAHAMAS has never used, owned, leased, mortgaged or had any other lien or interest in real, personal, or intangible property within the State of Florida, or elsewhere in the United States and has never paid any taxes to the State of Florida or to any other State or territory in the United States.

14. SUN BAHAMAS has never owned any assets in the State of Florida or elsewhere in the United States.

15. SUN BAHAMAS has never maintained a telephone number, mailing address, place of business, or bank account in the State of Florida or elsewhere in the United States.

16. SUN BAHAMAS has never maintained a registered agent in the State of Florida or elsewhere in the United States and have never been subject to service of process in the State of

Florida or elsewhere United States. SUN BAHAMAS has never authorized any person or entity to accept service of process on its behalf outside of the Bahamas.

17. SUN BAHAMAS' business operations has always been limited to the Bahamas.

18. SUN BAHAMAS has never operated a tour in the State of Florida or elsewhere in the United States.

19. SUN BAHAMAS has never engaged in substantial and not isolated activities in the State of Florida or elsewhere in the United States.

20. SUN BAHAMAS has never operated, conducted, engaged in or carried on a business venture, or had an office or agency in Florida or elsewhere in the United States.

21. SUN BAHAMAS has never operated vessels in the waters of the State of Florida or elsewhere in the United States.

22. SUN BAHAMAS has never agreed to indemnify Carnival within the meaning of Florida Statutes Section 48.193(1)(d).

23. SUN BAHAMAS has never insured Carnival or any entity in Florida or elsewhere in the United States.

24. SUN BAHAMAS has never breached any contract requiring performance in the State of Florida or elsewhere in the United States

25. SUN BAHAMAS has never been in a principal/agent, joint venture, employer/employee and/or partnership relationship with Carnival or any other cruise line/cruise operator or entity located outside in Florida or elsewhere in the United States.

26. SUN BAHAMAS has never had an intention to create a joint venture with Carnival or any other cruise line/cruise operator.

27. Carnival has never controlled or had the right to control any aspect of the SUN BAHAMAS or its operations or vice versa.

28. There has never been a joint proprietary interest between SUN BAHAMAS and Carnival. Carnival has never had a proprietary interest in any aspect of the SUN BAHAMAS or vice versa.

29. SUN BAHAMAS has never shared nor had the right to share in the profits of Carnival or vice versa.

30. SUN BAHAMAS has never shared nor had the duty to share in the losses of Carnival or vice versa.

31. At all material times every single tour that SUN BAHAMAS offered has been exclusively offered by SUN BAHAMAS, not Carnival. Neither Carnival, nor any other entity doing business in the United States has ever owned, operated, managed or controlled any aspect of SUN BAHAMAS or the tours SUN BAHAMAS owns.

32. SUN BAHAMAS has never entered into an agreement with Carnival imposing an obligation to benefit third parties, including Carnival passengers, containing an express or implied provision establishing intent to primarily or directly benefit third parties, including but not limited to cruise ship passengers, or guaranteeing safe passage.

33. SUN BAHAMAS knows of no connection that the incident alleged in Plaintiffs Complaint has to the State of Florida, and the alleged incident did not cause injury to a person or property located in the State of Florida.

34. The alleged incident in Plaintiffs Complaint occurred in the Bahamas.

## SWORN DECLARATION

Under penalties of perjury, I declare that I have read the foregoing Declaration and that the facts stated in it are true to the best of my knowledge and belief. Florida Statute §92.525(1)(c)(2). I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Federal Statute U.S.C. §1746.

Dated: April 10, 2019

                                                LUCIANA INGRAHAM
                                                SENIOR MANAGER
                                                SUN BAHAMAS WATER SPORTS
                                                d/b/a BAHAMAS STORAGE AND
                                                SHIPPING SUPPLIES COMPANY LTD.

# EXHIBIT "A"

## STANDARD SHORE EXCURSION INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT is made this **20th March, 2017**, between CARNIVAL CRUISE LINES, a division of CARNIVAL CORPORATION (hereinafter "CARNIVAL"), having a principal place of business at 3655 N.W. 87TH. AVENUE, MIAMI, FLORIDA 33178, and **Sun Bahamas Water Sports** (hereinafter called "OPERATOR"), having a principal place of business at: **Clearview Heights, Old Fort, Nassau, New Providence Bahamas**

### TERMS AND CONDITIONS

1. **Identification of Vessels**
   CARNIVAL will provide the following vessels identified below for the sale of Shore Excursions to its Guests:

| | | | |
|---|---|---|---|
| CARNIVAL CONQUEST | CARNIVAL BREEZE | CARNIVAL DREAM | CARNIVAL ECSTASY |
| CARNIVAL ELATION | CARNIVAL FANTASY | CARNIVAL FREEDOM | CARNIVAL FASCINATION |
| CARNIVAL GLORY | CARNIVAL IMAGINATION | CARNIVAL INSPIRATION | CARNIVAL LEGEND |
| CARNIVAL LIBERTY | CARNIVAL MAGIC | CARNIVAL MIRACLE | CARNIVAL PARADISE |
| CARNIVAL PRIDE | CARNIVAL SENSATION | CARNIVAL SPLENDOR | CARNIVAL SPIRIT |
| CARNIVAL TRIUMPH | CARNIVAL VALOR | CARNIVAL VICTORY | CARNIVAL SUNSHINE |
| CARNIVAL VISTA | | | |

The above vessels, together with such other vessels as may hereafter be named by CARNIVAL, including those of any of its subsidiaries, associated or affiliated companies now or after the date hereof, are herein referred to as the "Vessels."

2. **Purpose of Agreement**
   CARNIVAL is in the business of providing cruise vacations aboard the Vessels that call on various ports worldwide. OPERATOR is an independent contractor in the business of arranging and providing Shore Excursions and is willing to provide the Shore Excursions to Guests on the Vessels. During the term of this Agreement (set forth below), CARNIVAL agrees to sell tickets for Shore Excursions to Vessel Guests and OPERATOR agrees to arrange and provide Shore Excursions, subject to and in accordance with this Agreement. As used in this Agreement, the term "Shore Excursions" refers to the shore excursion listed herein below together with such additional or substitute shore excursions as may be added to this Agreement by written Addendum with the mutual consent of the parties. Any new or different shore excursions added to this Agreement by way of Addendum signed by both parties hereto shall be governed by the same terms and condition as this Agreement as if originally and fully set forth in this Agreement.

SHORE EXCURSION:

| PORT | TOUR DESCRIPTION | NET PRICE ADULT | CHILD |
|---|---|---|---|
| Nassau | Ultimate Island Snorkel & Beach Safari |  | |

3. **Term of Agreement**
   This Agreement shall commence on **23rd March, 2017**, and continue for the term of one year; provided, however, that (i) CARNIVAL may terminate this Agreement at any time, (ii) OPERATOR may terminate this Agreement at any time by giving at least thirty (30) days prior written notice and (iii) to the extent neither party gives notice of its intent to terminate this Agreement at the end of such initial one year term, this Agreement shall continue in full force and effect for additional one-year terms, subject to each party's termination rights as set forth in clauses (i) and (ii) above.

4. **Advertising and Sale of Shore Excursions**
   During the term of this Agreement, CARNIVAL agrees to advertise and sell to Guests on the Vessels the Shore Excursions for the ports listed above. CARNIVAL may charge its Guests such prices as it determines in its sole discretion for the Shore Excursions. CARNIVAL shall collect all proceeds directly from its Guests. Whenever possible, CARNIVAL will advise the OPERATOR's representative via telephone, radio telephone, telex or telefax as to the number of tickets actually sold as well as the anticipated sales of tickets prior to arrival in port. OPERATOR's representative will be advised as to final ticket sales as soon as practicable after arrival in port. Those Guests purchasing tickets for a Shore Excursion are herein referred to as "Excursion Guests."

5. **Shore Excursions**
   OPERATOR will arrange and provide the Shore Excursions to the Excursion Guests. OPERATOR acknowledges and

Rev. 2/14/01

represents that its Shore Excursions satisfy and will continue to satisfy the highest standards of quality in the industry, and all of OPERATOR's employees will act in a professional manner consistent with generally accepted industry standards. OPERATOR acknowledges that the control and responsibility of all aspects of the Shore Excursion remain exclusively the OPERATOR's. With respect to any water-based Shore Excursion, OPERATOR shall ensure that (i) no divers or persons will be allowed to touch, stand on, or damage any coral or reef formation (ii) no person shall disturb or remove or collect from the sea any species of flora and fauna, including rocks, dead coral, shells or sand. OPERATOR acknowledges and represents that it will exercise reasonable care for Excursion Guests' safety at all times. If any Excursion Guest is dissatisfied with a Shore Excursion such that CARNIVAL, in its sole discretion, determines that full or partial reimbursement of the Shore Excursion ticket is appropriate, the amount so reimbursed shall be deducted by CARNIVAL from amounts otherwise due OPERATOR under this Agreement. OPERATOR shall collect Shore Excursion tickets from the Excursion Guests.

Any activities that are independent of this contract, or that are not listed in the Tour Description above, may not be sold during the Shore Excursion. The following activities are completely prohibited as forming any part of a Shore Excursion:

a) Parasailing   c) Air Tours   e) All Terrain Vehicles (ATV's)
b) Jet Ski Rentals   d) Mopeds   f) Motorcycles

OPERATOR shall not solicit or make any prior arrangements with current or future Carnival Guests prior to or during the cruise which the mentioned Guest or group of Guests will be part of. If OPERATOR is contacted by anyone -- individual, group or Guest -- prior to a cruise wishing to book directly, OPERATOR is to take down all pertinent information and contact Tour Operations with the request. Tour Operations will then work collectively with OPERATOR in creating the excursion in question to the benefit of both parties and for the service of our Guests. If OPERATOR breaches the terms of this paragraph then, in CARNIVAL's sole discretion and by written notice to OPERATOR, it may suspend OPERATOR's right to operate one or more of its Shore Excursions for CARNIVAL Guests hereunder until OPERATOR receives written notice from CARNIVAL otherwise.

OPERATOR shall ensure that any live, non-feral, captive animals featured on display by OPERATOR, or that are pets of OPERATOR, which have or may have contact with CARNIVAL's Guests during a Shore Excursion or on OPERATOR's premises, must have received all required vaccinations as required by law. Upon request by CARNIVAL, OPERATOR shall promptly provide proof that all such animals are up to date with such required vaccinations.

6. <u>Payments to OPERATOR</u>
Immediately following conclusion of each Shore Excursion, OPERATOR's representative will present to the Vessel's Shore Excursion Manager all Shore Excursion tickets collected from the Excursion Guests. Payments by CARNIVAL shall only be made in respect of tickets presented by the OPERATOR's representative and verified by the Vessel's Shore Excursion Manager. Payment will be made in the form wire transfer from the main office. Carnival reserves the right to not pay for Shore Excursion tickets redeemed more than 60 days after the applicable Shore Excursion date. Payment of any Shore Excursion ticket turned in later than 60 days after such Shore Excursion date will require the written approval of the Director of Tour Operations.

7. <u>Net Prices</u>
OPERATOR represents and warrants that the Net Prices stated above are currently equal to or less than the net prices offered by OPERATOR to any other cruise line or operator. If, during the Term of Agreement, OPERATOR shall offer net prices to any other cruise line or operator that are less than the net prices stated above, the net prices charged CARNIVAL shall be reduced to the level offered to such other cruise line or operator such that the net prices payable by CARNIVAL shall always be equal to or less than the net prices charged any other cruise line or operator.

8. <u>No Unauthorized Payments</u>
OPERATOR represents and warrants that no agreements (verbal or written) have been or will be entered into with any employee or agent of CARNIVAL pursuant to which OPERATOR shall make any payment or gift to, or otherwise provide any consideration to, such employee or agent for any reason whatsoever. If any such employee or agent shall request or otherwise make reference to any such payment, gift or other consideration, OPERATOR shall immediately notify CARNIVAL in writing at the address stated above.

9. <u>Anticorruption Clauses</u>
OPERATOR represents, warrants, and covenants that none of its owners, principal officers, directors, shareholders, or employees expected to be significantly involved in the performance of services for Carnival meet any of the following:
   (a) have been charged with a criminal offense;
   (b) is (i) a current official or employee of any government agency or government-owned enterprise (including officers, directors, employees, or other persons engaged by the customer or any of its affiliates); (ii) an official of a political party; (iii) a candidate for public office; (iv) a close relative of an individual described in (i), (ii), (iii) or (iv); or (v) a past official of any government agency, enterprise, or party; or
   (c) is a member of or related to a royal family.

Rev. 2/14/01

Operator represents, warrants, and covenants that, in connection with activities performed under this agreement or on behalf of Carnival, or in connection with any remuneration Operator has received or will received from Carnival, Operator has not and will not offer, promise, authorize, pay, or act in furtherance of an offer, promise, authorization, or payment of anything of value, directly or indirectly, to a Government Official (as hereinafter defined), political party or party official, candidate for political office, or official of a public international organization, in order to obtain or retain business, to secure an improper advantage for any person, or to secure or influence discretionary action, inaction or a decision of a Government Official(s) ("Improper Payment Activity"). For purposes of this agreement, the term "Government Official" shall mean and include any official or employee of national, local or provincial or state government department, agency, or instrumentality, as well as an official in the judicial, legislative, or military, anyone acting in an official capacity for any government, or any immediate family member of such persons.

Carnival shall have the right to terminate this agreement immediately upon written notice to Operator in the event Carnival develops a good faith belief that Operator has breached any of the obligations, representations, and warranties in the anti-corruption provisions in this agreement. In the event Carnival learns of information raising a reasonable possibility of such a breach, Carnival shall be entitled to suspend performance of its obligations – including any payment obligations – for a reasonable period during in order to investigate such a possible breach.

If a breach is caused by or linked to payments by Operator or any individual or entity acting on its behalf to a foreign official as defined by the U.S. Foreign Corrupt Practices Act ("FCPA"), any obligations of payment by Carnival to Operator shall be immediately extinguished and Carnival shall have the right to demand return of all funds paid to Operator by Carnival, except to the extent Operator can provide reasonable assurances that all or some portion of the funds were not used to make a payment to a foreign official.

OPERATOR acknowledges that CARNIVAL has established a Business Partner Code of Conduct that can be found at http://phx.corporate-ir.net/phoenix.zhtml?c=140690&p=irol-govconduct.

10. <u>Insurance</u>
OPERATOR is responsible for procuring and maintaining liability insurance against any and all injuries, whether personal or otherwise, to Guests and damage or loss to their property, as follows:

   a) OPERATOR is responsible for procuring and maintaining liability insurance against any and all injuries, whether personal or otherwise, to Guests and damage or loss to their property. Operator's insurance must cover all activities that occur on the tour. If Operator utilizes any road, air or water conveyance, the below insurance requirements must be met in addition to the General Liability requirement.    General Liability: U.S. $2 million per occurrence

   b) Auto Liability: U.S. $2 million per occurrence (15 passengers or less in vehicle).

   c) Watercraft Liability: U.S. $2 million per occurrence

   d) Scuba/Snuba Liability: US$1 million per occurrence for Dive Instructors Professional Liability

   e) Aircraft Liability: US$1 million per passenger including war risk liability.

   f) If Operator subcontracts for any services, the subcontractor must also provide insurance for its specific services which meets the above requirements. If the subcontractor cannot meet these requirements, Operator's insurance must provide contingent liability covering the difference in conditions to the subcontractor's insurance. This does not apply to subcontractors providing aircraft. The actual air operator must meet all minimum aircraft liability insurance requirements.

   g) The policy territory must be worldwide covering claims or suits brought in any jurisdiction.

   h) Carnival Cruise Lines, Carnival Corporation, and their affiliated and/or related companies must be named as additional insured's including a waiver of subrogation with respect to the liability of the named insured.

   i) Any deductible/self-insured retention that applies to insurance policies listed under a) through f) of this section 10 cannot exceed $100,000 per occurrence and must be noted on the certificate of insurance.

   j) The insurer must be rated at least A- VII by AM Best or equivalent.

   k) Operator will provide CARNIVAL with a certificate of insurance certificate in English within 30 days of the execution of this agreement and annually thereafter.

Rev. 2/14/01

11. Indemnification
    In addition to and notwithstanding the insuring provision set forth above, OPERATOR agrees to indemnify, save, protect and defend CARNIVAL, and the employees and agents of CARNIVAL and hold them harmless from and against any and all losses, claims, liabilities, damages, causes of actions, legal fees, costs and expenses which may arise or be claimed against CARNIVAL related to, in connection with, as a consequence of or arising from the business or operations of the OPERATOR and/or the services provided to CARNIVAL and its Guests, as well as any breach of this Agreement by OPERATOR. Additionally, OPERATOR shall be fully liable for acts of any its employees, officers, representatives, subcontractors (whether permitted pursuant to the terms of this Agreement or not) or agents, relating to, in connection with or otherwise arising as a consequence of the Shore Excursions.

12. Relationship of the Parties
    OPERATOR's relationship with CARNIVAL during the term of this agreement shall be that of an Independent Contractor. OPERATOR shall not have, and shall not represent that it has, any power, right or authority to bind CARNIVAL or to assume or create any obligation or responsibility, express or implied, on behalf of CARNIVAL or in CARNIVAL's name. Nothing related in this agreement shall be construed as constituting OPERATOR and CARNIVAL as partners, or as treating the relationships of employer and employee, franchisor and franchisee, master and servant or principal and agent or joint venturers between the parties hereto. OPERATOR shall not represent, communicate or imply in any advertising, literature, announcement or by any other means that it is anything other than an Independent Contractor.

13. Representations and Warranties
    Each party represents and warrants to the other party that (a) it has the requisite corporate authority to enter into and perform this Agreement, (b) this Agreement constitutes its legally binding obligation, enforceable in accordance with its terms, and (c) its execution and performance under this Agreement will not result in a breach of any obligation to any third party or infringe or otherwise violate any third party's rights.

14. Right to Inspect
    CARNIVAL or its representatives shall be entitled to inspect, audit and copy the Carnival-related Shore Excursion information in OPERATOR's books and records as contemplated hereunder at any reasonable time in order to verify OPERATOR's compliance with this Agreement. Operator shall keep and maintain its books, records and accounts in reasonable detail to accurately, completely and fairly reflect its activities and transactions hereunder, including the recipient and nature of every payment or expenditure in connection with Operator's performance of this agreement.

15. Miscellaneous Terms

    a) Modification:
       This Agreement may only be modified by a writing duly executed by the parties hereto.
    b) Waivers:
       Any waiver of any of the terms and conditions of this Agreement shall only be effective if given in writing and, if given by a corporation, then only if signed by a duly authorized officer of such corporation.
    c) Litigation:
       In the event of litigation, the prevailing party shall be entitled to recover all costs incurred in connection with the litigation including, without limitation, reasonable attorney's fees. OPERATOR consents to the personal jurisdiction over it and to the venue of the courts serving the Southern District of Florida in the event of any lawsuit to which CARNIVAL is a party and which is related to, in connection with, arising from or involving the Shore Excursion or the terms of this Agreement.
    d) Entire Agreement, Survivability and Notice:
       This Agreement supersedes any and all oral or written agreements heretofore made relating to the subject matter hereof and constitutes the entire agreement of the parties relating to the subject matter hereof. Sections 9, 10, 13 and 14 shall survive the termination of this Agreement. All notices given hereunder, which in any event must specifically reference the title, parties and date of this Agreement, shall be to the party's principal place of business as set forth herein (or other address to the extent proper notice has been given by the recipient which provides for a different notice address), if to CARNIVAL attention Tour Operations Director, and if to OPERATOR, _Sun Bahamas Water Sports e Tours_. Alternatively, notice may be given, which in any event must specifically reference the title, parties and date of this Agreement, by (i) facsimile, if to CARNIVAL at **(305) 406-4904** and if to OPERATOR at ▮▮▮▮▮▮ (or other facsimile numbers to the extent proper notice has been given by the recipient which provides for different facsimile numbers) or (ii) email which specifically references this Agreement, if to CARNIVAL at acascais@carnival.com and if to OPERATOR at ▮▮▮▮▮ or other email addresses to the extent proper notice has been given by the recipient which provides for different email addresses).

Rev. 2/14/01

e) **Governing Law:**
This Agreement shall be governed by and construed in accordance with the General Maritime Law of the United States and/or the Laws of the State of Florida, U.S.A.

f) **Assignment:**
Neither party may assign any of its rights or obligation under this Agreement (by operation of law or otherwise) without the written consent of the other party and any attempt to do so shall be null and void (including any subcontracting by OPERATOR).

OPERATOR: Sun Bahamas Water Sports & Tours
BY: _Pagraha_
TITLE: Owner / Senior Manager

CARNIVAL CRUISE LINES,
a division of CARNIVAL CORPORATION
BY: ERIKA TACHE
TITLE: DIRECTOR TOUR OPERATIONS

Rev. 2/14/01